IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

JOSE ILLARAZA                    :          CIVIL ACTION
                                 :
              v.                 :
                                 :
HOVENSA LLC                      :          NO. 07-125

------------------------------

LUIS ILLARAZA                    :          CIVIL ACTION
                                 :
              v.                 :
                                 :
HOVENSA LLC                      :          NO. 08-59


MEMORANDUM

Bartle, J.                                  November 10, 2014

         In these consolidated civil actions, plaintiffs Jose

Illaraza ("Jose") and Luis Illaraza ("Luis"),[1] who are brothers,

bring claims against defendant HOVENSA, LLC ("HOVENSA") for wrongful

discharge, slander and defamation *per se*, tortious interference with

contractual relationship, abuse of process, malicious prosecution,

and intentional or in the alternative negligent infliction of

emotional distress.  Luis also asserts a claim against HOVENSA for

false imprisonment.  These lawsuits arise out of the brothers'

alleged involvement in an August 2006 theft of an air conditioner

---

1.  There is some confusion about the proper spelling of the
last name of the plaintiffs, even in their own filings.  For the
sake of consistency, we adopt the spelling used by Judge Wilma
A. Lewis in her memorandum opinion of March 31, 2012.  See
Illaraza v. HOVENSA, LLC, Nos. 07-125 & 08-59, 2012 WL 1154446
(D.V.I. Mar. 31, 2012); see also Illaraza v. HOVENSA, LLC, Nos.
07-125 & 08-59, 2014 WL 4746774, at *1 n.1 (D.V.I. Sept. 24,
2014).

unit from HOVENSA's oil refinery on St. Croix, and the company's decision to bar the brothers from the refinery following the alleged theft.

Now before the court are the motions of defendant HOVENSA for summary judgment on all of plaintiffs' claims against it under Rule 56 of the Federal Rules of Civil Procedure.[2]

## I.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Rule 56(c) states:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or ... showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving

---

2. Plaintiffs' claims against their employer Anthony Crane International have been dismissed, and their claims against their union, United Steelworkers of America, were resolved against them on summary judgment.

party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).
Summary judgment is granted where there is insufficient record
evidence for a reasonable factfinder to find for the plaintiffs.
Id. at 252.  "The mere existence of a scintilla of evidence in
support of the plaintiff's position will be insufficient; there must
be evidence on which the factfinder could reasonably find for the
plaintiff."  Anderson, 477 U.S. at 252.

When ruling on a motion for summary judgment, we may only
rely on admissible evidence.  See, e.g., Blackburn v. United Parcel
Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).  We view the facts and
draw all inferences in favor of the nonmoving party.  In re Flat
Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).  However,
"an inference based upon a speculation or conjecture does not create
a material factual dispute sufficient to defeat entry of summary
judgment."  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12
(3d Cir. 1990).

II.

The following facts are undisputed or viewed in the light
most favorable to the Illaraza brothers as the nonmovants.

Luis and Jose Illaraza are licensed crane and heavy
equipment operators who were employed by Anthony Crane International
("ACI"), which did virtually all of its work at HOVENSA's petroleum

refinery on St. Croix.[3]  As ACI employees, plaintiffs worked at the refinery.  At the time of plaintiffs' employment with ACI, HOVENSA was the largest employer on the island.  The terms of plaintiffs' employment with ACI were governed, at least in part, by a collective bargaining agreement ("CBA") between ACI and the United Steelworkers of America ("Steelworkers").  This CBA set forth the framework for plaintiffs' wages and the benefits provided to them by ACI.  HOVENSA was not a party to the CBA.

Under the terms of a contract between ACI and HOVENSA (the "contract"), ACI provided services at HOVENSA's refinery.  The contract characterized ACI as an independent contractor and its employees as "contractor's employees."  ACI was responsible, among other things, for rigging cranes, refueling equipment, and managing a waste site at the refinery.  The contract required ACI to administer pre-employment tests to any potential employees who would be hired to work at the refinery in order to "ensure that only those who are qualified are hired," and described the areas that such a test should cover.  Under the contract, the number of personnel to be provided by ACI was subject to approval by HOVENSA.  The contract further set forth hourly compensation rates that HOVENSA would pay

---

3.  The record confirms that ACI had almost no work on St. Croix outside of its work for HOVENSA.  The only apparent exception is a brief period (plaintiffs claim that it was two weeks) during which ACI completed a contract for an entity called VIALCO. Jose Illaraza worked for ACI on its VIALCO contract during this period.

to ACI for ACI personnel.  Plaintiffs received their paychecks from ACI and reported their hours to ACI.

The contract allowed for HOVENSA supervision and oversight of the work of ACI employees at the refinery and enabled HOVENSA to provide field personnel with the authority to direct the actions of ACI's operators.  ACI was bound by the contract to comply with the instructions of these HOVENSA supervisors to the extent that their instructions related directly to the work being supervised. Nonetheless, plaintiffs were primarily supervised by ACI employees. They received most of their day-to-day instructions from their ACI supervisor or from an ACI dispatcher.  The contract between ACI and HOVENSA also made explicit that representatives provided by HOVENSA would "not control or supervise [ACI]'s day-to-day work since [ACI] is a qualified independent contractor."

The contract gave HOVENSA certain management and oversight responsibilities over the refinery's waste site.  HOVENSA personnel, including environmental-compliance officials, inspected the waste site periodically.  HOVENSA also had the responsibility to procure the necessary permits and licenses for ACI's work on the refinery and to provide security in accordance with its existing policies.

ACI and its employees working at the HOVENSA refinery were subject to detailed plant rules and procedures which were binding on all contractors at the refinery.  A detailed list of these rules and procedures appeared as an attachment to the original HOVENSA-ACI

contract.  Among these rules were requirements that ACI maintain current contact information and personal data for each employee, that each employee comply with HOVENSA security procedures (such as parking registration requirements), that ACI employees stay off refinery premises unless scheduled to work, and that they not bring unauthorized visitors onto the property.  ACI employees had to submit all bags for inspection, to report any improper conduct of which they are aware, to wear certain required safety articles and protective gear, and to refrain from posting notices, calendars, pictures, and the like without prior approval.  ACI employees were barred from certain activities which included smoking, possessing or being under the influence of any controlled substance or intoxicant, and possessing cell phones at work without prior approval. They were not permitted to wear clothing deemed by HOVENSA to be "offensive or provocative."

        In addition, the rules and procedures provided for general cleanliness and care of the refinery premises and equipment and required "the employee's company" to provide safety hats.  HOVENSA displayed rules and regulations prominently in various locations around the refinery although neither plaintiff recalled ever receiving a written copy of them.

HOVENSA maintained procedures for granting ACI's employees access to the refinery.[4]  According to HOVENSA Director of Administration Services Rocco Colabella ("Colabella"), any individual seeking entry to the refinery (including contractor employees like those working for ACI) had to obtain an identification badge from HOVENSA and were subject to a security screening by HOVENSA's security department.  After completing the safety comprehension examination provided for by the contract and submitting to a drug test, ACI employees were required to submit badge applications, which were subject to HOVENSA approval.  HOVENSA sometimes ran police background checks on potential employees before granting badge applications.  There is no evidence as to whether such a check was conducted with respect to Jose or Luis.

Before the events of August 2006 which are the subject of this lawsuit, neither plaintiff had ever been disciplined in his capacity as an ACI worker.  As far as the record discloses, the brothers were satisfactory employees.  However, at some point prior to August 10, 2006, HOVENSA Security Manager Jay Galindo ("Galindo") had begun to suspect that the brothers were involved in a rash of missing items at the refinery.  According to Colabella, Galindo had

---

4.  Neither the contract between ACI and HOVENSA nor the refinery rules and regulations promulgated by HOVENSA contain any explicit mention of this process.  However, both HOVENSA Security Manager Jay Galindo and HOVENSA Director of Administration Services Rocco Colabella described the process as a prerequisite to refinery access.

an informant at the refinery who had led him to believe that the
Illarazas were linked to the theft of items including tools,
welders, and equipment parts from HOVENSA property.

The Illaraza brothers' claims against HOVENSA hinge on or
arise out of the events of August 10 and 11 of 2006.  On August 10,
an ACI foreman named Nelven Noelien ("Noelien"), who happened to be
Luis's and Jose's supervisor, signed an air conditioning unit (the
"a/c unit") out of HOVENSA's warehouse.  Noelien later claimed that
he did so to install it as a replacement for the inoperative air
conditioner in the trailer where his work crew usually ate lunch and
changed their clothes.  In his deposition, Jose asserted that this
was his understanding of Noelien's intentions when he helped Noelien
move the a/c unit from the HOVENSA warehouse into the white pickup
truck which belonged to ACI and which had been assigned to Noelien.

Plaintiffs assert that the a/c unit was supposed to be
installed in the trailer that same day.  However, a sudden change in
their work schedule required the three men to return to the refinery
at 10 p.m. that night.  As a result, they would need to leave work
earlier that evening if they wanted to get any rest.  They claim
that they did not have time to complete the installation on the
evening of August 10.  Because of this time constraint, Noelien
decided to move the a/c unit from the open bed of the pickup truck
into the front compartment of an ACI-owned red tractor-trailer at

the refinery.  Jose helped Noelien secure the a/c unit in the red tractor-trailer after which the three men left the refinery.[5]

The same evening, HOVENSA security officer Juan Espinosa ("Espinosa") received a telephone call from a person who refused to identify himself.  According to Espinosa's later testimony, the caller stated that he "was in a location where he saw something suspicious happening."  The caller advised Espinosa to check the location at the refinery where the trailers were stored and added that he had observed men putting boxes into some of the trucks. Espinosa recalled that the caller seemed apprehensive, particularly about the fact that HOVENSA maintained multiple security cameras at the refinery.  Plaintiffs infer that the caller's nervousness, coupled with his reluctance to identify himself, stemmed from concern that his own actions had been captured on camera and that he hoped to "save his own skin" by calling in a tip.

In response to the call, Espinosa and fellow security officer Blaise Charles went to the location described by the tipster but were unable to access any of the locked trucks that were parked there.  They contacted Galindo, who in turn contacted HOVENSA's locksmith, Nick Henry ("Henry").  Together, Henry and Galindo returned to the site and unlocked the red tractor-trailer.  Inside

---

5.  Luis, for his part, stated in his deposition that he played no role in helping Noelien to transfer the a/c unit into the pickup truck, or from the pickup truck to the tractor-trailer. He maintained that he was unaware of either transfer at the time it occurred.

its cab, they found the a/c unit.  Galindo later testified that it was located in the truck's "sleeping compartment," which was separated from the front seat by a curtain.  Galindo took photographs of the truck and the a/c unit and made note of the unit's serial number.

Galindo notified Henry, HOVENSA Harbor Security Officer Chris Webster ("Webster"), and another security employee named Brian Harrell ("Harrell") that they should report to the refinery early the next morning to assist with an investigation.  At some point that evening, Galindo also contacted Haraldo Charles ("Charles"), a police officer who often "moonlighted" for HOVENSA by directing traffic at the refinery.  Galindo asked Charles to stay at the refinery beyond his normal departure time of 8:00 a.m. on the morning of August 11, 2006, in case Galindo needed his assistance. Finally, Galindo contacted Colabella, HOVENSA's Director of Administration Services, to alert him to the investigation.

Meanwhile, the Illaraza brothers, as well as Noelien, returned as scheduled to the refinery at 10:00 p.m. on August 10. They remained there working until approximately 3:00 a.m. on August 11.  At that point, knowing they needed to return to work again before 5:00 a.m., they left the refinery to obtain some rest.

On the morning of August 11, HOVENSA was slated to donate a number of trailers to the IQRA Academy, a school on St. Croix. The trailers were to be transported to the school by a convoy of

-10-

trucks.  Early that morning, Galindo, along with Harrell, Webster, and Henry, initiated surveillance of the convoy.  Luis Illaraza arrived at the refinery before 5:00 a.m., while Jose, who had overslept, did not arrive until shortly after 5:00.  By the time Jose entered the refinery, the convoy was already approaching the refinery gates.  Jose jumped into the red tractor-trailer, which was being driven by Luis and which contained the a/c unit.  In the rush to leave the refinery, Jose has stated that he had forgotten that the a/c unit was still in the tractor-trailer.  As the convoy left the refinery, HOVENSA security required the employees to exit the trucks and display their badges.  Security officials also wrote down the license plate numbers for each truck.

While the convoy drove to the IQRA Academy under police escort, Galindo made contact with Kevin Scott ("Scott"), the manager of the HOVENSA warehouse.  Galindo provided Scott with the serial number that he had collected from the a/c unit the previous evening.  An email from Scott, sent that morning to Galindo and HOVENSA electrical supervisor Dana Hanning, confirmed that an a/c unit with the same serial number as the one in the red tractor-trailer had been signed out of HOVENSA's warehouse by Noelien on August 10.

Meanwhile, the convoy arrived at the IQRA Academy, where the team worked to remove the trailers from the trucks and to set them in place.  HOVENSA's civil superintendent, Bobby Gustafson ("Gustafson"), assisted the team at the school for a period of time.

-11-

Following Gustafson's departure, Noelien drove the white pickup truck, which had been assigned to him by ACI, alongside the red tractor-trailer containing the a/c unit.  At his request, Jose then helped him to move the a/c unit into the pickup truck.

Noelien and Luis began to drive away from the IQRA Academy in the white pickup truck while Jose remained behind to finish work at the school.  As Noelien and Luis did so, Harrell followed in his vehicle, with Webster as a passenger, and pulled up in front of the pickup truck driven by Noelien.  Galindo, who was driving a second vehicle with Henry as a passenger, pulled up alongside the pickup truck.  Unable to proceed, Noelien stopped and exited the truck, while Luis remained in the passenger seat.  Luis admitted in his deposition that no one explicitly told him to stay where he was.  In his Counter Statement of Facts, he stated that "the implication to him was he had to stay in the truck."

Noelien stepped out of the truck and approached Galindo. According to Galindo, Noelien told him that he "was not going to lie" and that he had stolen the a/c unit.  Galindo has also testified that Noelien told him that the plaintiffs "were involved, that they had knowledge."  Galindo's handwritten contemporaneous notes say "Jose + Luis both knew about it."  Webster, who was with Galindo at the time, testified that he also overheard Noelien say "I did a stupid thing, you know.  I'm sorry."

Galindo contacted HOVENSA security guard Lazarus Joseph, who arrived and took a written statement from Noelien at Galindo's request. Noelien dictated his statement to Joseph, who wrote it down by hand. In his statement, Noelien admitted that "I intended to transfer the air conditioning unit into the truck assigned to me from Maxim Crane. I intended to carry the unit to my house. . . . Whatever I did I am very sorry and ashamed." Noelien signed the statement. Joseph told Noelien that he could correct or add to his statement later if he chose to do so. A notation to this effect was made in the statement itself, alongside Noelien's signature.

As Galindo and Joseph were speaking with Noelien, Webster stood alongside the pickup truck where Luis was still sitting. Webster testified that he said hello to Luis but that they exchanged few words.

Galindo contacted Officer Charles, who was still at the HOVENSA refinery following the end of his morning shift and asked him to come to the IQRA Academy and assist in an investigation. Officer Charles, in turn, contacted the Virgin Islands Police Department ("VIPD"). Approximately 30 minutes after the initial stop of the pickup truck, VIPD officers arrived at the school, and Galindo relayed to them his version of the sequence of events. The VIPD arrested both Noelien and Luis, and HOVENSA officials confiscated their refinery badges.

-13-

VIPD Officers then arrested Jose, and HOVENSA confiscated his badge as well.  With the exception of Webster's brief conversation with Luis, no HOVENSA official spoke to either of the brothers about the alleged theft prior to the arrests.

Following their arrests, Luis and Jose, along with Noelien, were transported to the Police Department, where the three were fingerprinted and placed together in a cell.  Jose was released into the custody of his mother the same day while Luis remained in jail until August 14, when he, too was released into his mother's custody.  At around the same time, HOVENSA's security department deactivated the refinery access badges of Luis, Jose and Noelien.

The record supports plaintiffs' contention that the VIPD relied heavily on the statements of HOVENSA employees in making the decision to arrest them.  Specifically, Galindo testified that a report prepared by Officer Charles was based on information Galindo had provided to the VIPD.  He also confirmed that the VIPD based its arrests of Jose and Luis on the reports of several witnesses, all of whom were HOVENSA employees.  In addition, Galindo stated that the VIPD's offense report concerning the arrests was based on information he supplied. Photographs taken by Galindo at the scene of the arrest were also provided to the VIPD by HOVENSA.  Finally, a probable cause affidavit prepared by VIPD Officer Herminia Rivera appears to be

-14-

based exclusively on information provided by Galindo to Officer Rivera.

Approximately one week after the arrests, Noelien, who had by then been released from jail, contacted ACI General Manager Andy Alcorn.  Noelien presented Alcorn with an explanation for the events of August 10 and 11.  He stated that he had not had time on August 10 to install the a/c unit in the Waste Site trailer where the crew ate lunch and that he had inadvertently left it in the red truck when the convoy traveled to the IQRA Academy.  Noelien told Alcorn that he had been bringing the a/c unit back to HOVENSA at the time of his arrest.  At Alcorn's request, Noelien put his explanation in a typewritten statement approximately two days later. He explained that when he had told Galindo he was taking the a/c unit to his house, he had done so "jokingly," having perceived Galindo's inquiry as a "stupid pointless thing to ask [him]." Alcorn forwarded Noelien's statement to Galindo, who dismissed it as "ridiculous."  Galindo later testified that he never investigated or followed up on any of the explanations set forth in Noelien's typed statement.

Noelien ultimately pleaded guilty to the possession of stolen property and was sentenced to one year of probation.  He served his probation in Orlando, Florida, where he had obtained a job as a crane operator with ACI's parent company Maxim Crane.

In the weeks following the arrests of the three men, Galindo met with a person who claimed to be the anonymous informant who had alerted HOVENSA to the alleged theft.  Galindo paid him a reward of $500 for which he signed a receipt with the name "Wilfredo Rios."  Galindo has stated that this was not his actual name.

In July 2007, the Virgin Islands government elected not to prosecute the Illaraza brothers, and the charges against them pertaining to the alleged theft were dismissed without prejudice. Following the dismissal, Steelworkers representative Mike Francis ("Francis") sent ACI's Mike Corn ("Corn") a copy of the dismissal. ACI subsequently communicated to both Francis and HOVENSA that Luis and Jose were good workers whom ACI wanted to reinstate to continue their work at the HOVENSA refinery.  Colabella, however, responded that "due to the admitted theft of HOVENSA property," the men could not return to work there.  Since that time, neither Jose nor Luis has been permitted to do so.  According to his deposition testimony, Alcorn confirmed that the brothers were "effectively out of work" with ACI due to HOVENSA's refusal to permit them on refinery property.  During Alcorn's time at ACI, the company had never had work on St. Croix other than under its contracts with HOVENSA.

After August 10 and 11, 2006, certain HOVENSA employees made various statements about Jose and Luis and their involvement in the events of those days.  Plaintiffs emphasize, and the record confirms, that rumors about the events circulated at the HOVENSA

-16-

refinery and in the St. Croix community.  The record is often unclear as to the substance and source of the statements that made up these rumors.  It is apparent, however, that at least a portion of the gossip about the events consisted of statements that the Illaraza brothers had been arrested.  Statements were also made to the effect that the brothers had committed a theft, and that they had been caught stealing.  With some exceptions which we discuss below, the record does not make clear which individuals spread these rumors.  Instead, several deponents simply attributed them to HOVENSA security guards.  A report of plaintiffs' arrests also appeared in the police blotter of a local newspaper, the St. Croix Avis.  While Galindo confirmed that the Avis report contained the same information HOVENSA had provided to the VIPD, he denied that HOVENSA had provided information to the newspaper.

Since the events of August 10 and 11, 2006, Jose has reported headaches at least twice weekly, as well as extreme stress about how he will pay his bills and meet his obligations to his family.  He also reports trouble sleeping.  Luis has also indicated that he experiences stress and emotional suffering linked to the events, as well as headaches and sleeplessness.  Both plaintiffs report that they have sought medical attention for these ailments.

As of March 2010, when their depositions were taken, neither plaintiff has been employed full-time.

-17-

III.

We first address plaintiffs' claims for wrongful discharge under the Virgin Islands Wrongful Discharge Act ("WDA"), 24 V.I.C. § 76.  The WDA provides that "an employer may dismiss any employee" for any of nine reasons enumerated in subsection (a) of the statute.[6]

---

6.  The full text of the WDA provides as follows:

    (a)    Unless modified by union contract, an employer may dismiss any employee:

        (1)    who engages in a business which conflicts with his duties to his employer or renders him a rival of his employer;

        (2)    whose insolent or offensive conduct toward a customer of the employer injures the employer's business;

        (3)    whose use of intoxicants or controlled substances interferes with the proper discharge of his duties;

        (4)    who willfully and intentionally disobeys reasonable and lawful rules, orders, and instructions of the employer; provided, however, the employer shall not bar an employee from patronizing the employer's business after the employee's working hours are completed;

        (5)    who performs his work assignments in a negligent manner;

        (6)    whose continuous absences from his place of employment affect the interests of his employer;

        (7)    who is incompetent or inefficient, thereby impairing his usefulness to his employer;

        (8)    who is dishonest; or

        (9)    whose conduct is such that it leads to the refusal, reluctance or inability of other employees to work with him.

    (b)    The Commissioner may by rule or regulation adopt additional grounds for discharge of an employee not inconsistent with the provisions enumerated in subsection (a) of this section.

    (c)    Any employee discharged for reasons other than those stated in subsection (a) of this section shall be considered to have been wrongfully discharged; however,

-18-

Where an employee is terminated for a reason other than one of the nine articulated in subsection (a), a presumption exists that he has been wrongfully discharged.

The WDA applies to the dismissal of an "employee" by an "employer." As a result, whether or not HOVENSA was plaintiffs' employer is a threshold issue in determining whether plaintiffs' WDA claim can succeed.[7] Plaintiffs urge us to conclude that even though ACI was their employer HOVENSA is also properly considered their employer under a "joint employer" theory.

As a starting point, we look to the Third Circuit's decision in N.L.R.B. v. Browning-Ferris Indus. of Pa., Inc., 691 F.2d 1117 (3d Cir. 1982). There, in upholding an order of the National Labor Relations Board, the court explained that a joint

---

nothing in this section shall be construed as prohibiting an employer from terminating an employee as a result of the cessation of business operations or as a result of a general cutback in the work force due to economic hardship, or as a result of the employee's participation in concerted activity that is not protected by this title.

7. In their briefs, the parties have presumed that a WDA claim is properly analyzed under the same burden-shifting approach used for Title VII claims. In support of this presumption, both parties have relied on Rajbahadoorsingh v. Chase Manhattan Bank, NA, 168 F. Supp. 2d 496 (D.V.I. 2001). Since the parties filed their briefs, our Court of Appeals has called into question the application of this burden-shifting framework to WDA claims. Maynard v. Rivera, 675 F.3d 225, 230-31 (3d Cir. 2012). Like the Court of Appeals, we need not reach the issue of the proper framework under which to analyze WDA claims, as we resolve this particular claim on the threshold issue of HOVENSA's status as a joint employer.

-19-

employment relationship exists where "one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." Id. at 1123.  The Browning-Ferris court specified that the "joint employer" inquiry is a fact-intensive one.  Id. at 1121.  Such an analysis involves the consideration of factors which include, but are not limited to, the allegedly joint employers' shared right to hire and fire, their establishment of work hours, their control of compensation, their degree of supervision of employees, and their authority to devise rules.  Id. at 1124-25.

Our Court of Appeals has recently refined the Browning-Ferris standard for determining the existence of a joint-employer relationship.  In In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation, the court affirmed a district court order granting summary judgment in favor of the alleged joint employer. It directed that a joint-employer analysis should consider the alleged employer's "(1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records, including payroll, insurance, taxes, and the like."  683 F.3d 462, 469 (3d Cir. 2012).  These factors, the court explained, "reflect the facts that will generally

-20-

be most relevant in a joint employment context." Id.  However, the court cautioned that its list of factors was not exhaustive, and that district courts should consider all relevant evidence rather than confining themselves to "narrow legalistic definitions."  Id.

Although In re Enterprise addressed a claim brought under the Fair Labor Standards Act rather than a WDA claim, we find its framework instructive.  Taking the facts in the light most favorable to plaintiffs, and relying on the framework articulated in In re Enterprise, HOVENSA's relationship with ACI cannot properly be characterized as a joint employer relationship.

The record discloses that HOVENSA's role in the hiring and firing of ACI employees was minimal.  While HOVENSA maintained supplemental screening procedures for those ACI employees who were assigned to work at the HOVENSA refinery, including the "pre-employment test" provided for by the ACI-HOVENSA contract and the background checks that sometimes preceded the issuance of badges, the record contains no indication that HOVENSA had any say as to the persons ACI could hire.  Rather, HOVENSA's involvement in this aspect of ACI's personnel management was limited to restricting who could enter the HOVENSA refinery, not who could work for ACI.

Nor does the record contain any indication that HOVENSA played a role in ACI's procedures for dismissing employees. Plaintiffs maintain that HOVENSA's decision to deny them access to the refinery effectively amounted to a termination from ACI, since

-21-

the ACI-HOVENSA contract accounted for virtually all of ACI's work on St. Croix.  See note 5, supra.  Even if this may have been the case, it does not mean that HOVENSA had the authority to fire employees from ACI.  Indeed, Noelien was also denied access to the HOVENSA refinery following the alleged theft but continued to work for ACI's parent company, Maxim Crane, in Florida.  In short, HOVENSA's authority to revoke refinery badges did not amount to authority to fire ACI employees.

HOVENSA's role in the determination of hours, compensation, and benefits for ACI employees was also minimal.  The ACI-HOVENSA contract established a rate schedule under which HOVENSA would compensate ACI for its employees' time.  ACI was to submit periodically to HOVENSA invoices for the hours worked by its employees, including overtime, and HOVENSA was to compensate ACI on an hourly basis for this work.  It was ACI, however, that established the wages which plaintiffs ultimately received from ACI. HOVENSA was not a party to the CBA which set forth ACI employees' benefits.  In any event, in all relationships involving an independent contractor, the contract sets forth what the independent contractor will be paid.  This necessarily affects the compensation the employees of the independent contractor will receive.

Furthermore, the record makes clear that plaintiffs were primarily supervised by ACI.  The ACI-HOVENSA contract provided HOVENSA with oversight authority over ACI personnel, but on a day-

-22-

to-day basis, plaintiffs received the bulk of their instructions from Noelien and from an ACI dispatcher.  We also note that the ACI-HOVENSA contract made explicit that HOVENSA did "not control or supervise [ACI]'s day-to-day work."

HOVENSA did play a role in employee discipline, but only insofar as the company promulgated plant rules and procedures by which ACI's employees as well as others at the refinery were bound. In large part, these rules appear designed to maintain the type of safe and secure work environment that is particularly important at an oil refinery.  For example, HOVENSA's plant rules and procedures set forth limitations on who could enter the refinery and at what times, on the kinds of personal effects employees were permitted to bring to the refinery, and on conduct such as smoking, intoxication, and physical violence.  The plant rules and procedures also set forth detailed procedures for keeping the refinery property and equipment clean.  Ultimately, HOVENSA's rules focused more on refinery safety and security than on employee discipline.

ACI also maintained control of employee records.  ACI issued plaintiffs' paychecks, and they reported their hours to ACI. There is no indication in the record that HOVENSA played a role in ACI's employee scheduling or in its payroll procedures.  HOVENSA's plant rules and procedures required all contractors working with HOVENSA to maintain current personal data for each employee who

worked at the refinery.  It was ACI, and not HOVENSA, that actually kept these records.

The issue of joint employer status is a fact intensive inquiry.  We must always consider the specific circumstances involved.  In this case, the bulk of the factors cited by plaintiffs as evidence of a joint employer relationship are in reality necessary and proper requirements for maintaining safety and security at an oil refinery.  Particularly in the post-September 11, 2001 era, preventing unauthorized access to an oil refinery and maintaining a safe and secure work environment are of paramount importance, and HOVENSA's oversight of ACI's procedures appears designed to achieve those goals.  It is also consistent within the independent contractor relationship for HOVENSA to oversee ACI's work at an oil refinery where dangerous consequences can easily ensue if the work is not done properly.

HOVENSA points us to Boutin v. Exxon-Mobil Corp., 730 F. Supp. 2d 660 (S.D. Tex. 2010), a decision which sheds light on the unique context in which HOVENSA's procedures took place.  In that case, ExxonMobil argued that it was not the joint employer of a contract employee who worked at one of its chemical facilities in Texas, and that it was therefore exempt from liability for the employee's Title VII claim.  The court agreed.  It explained that "to the extent ExxonMobil supervised Boutin, it was to ensure that the contract with [her direct employer] was performed as required."

-24-

Id. at 682.  Similarly, we conclude that any supervision and
oversight of plaintiffs' work by HOVENSA was designed to contribute
to plant security and to ensure that ACI safely and properly
performed its contract and did not amount to joint employment.

IV.

We turn next to the plaintiffs' claims for slander and
defamation *per se*.  In support of these claims, plaintiffs point to
statements made by HOVENSA employees to the VIPD implicating them in
the theft; statements by HOVENSA to ACI and the Steelworkers about
their alleged involvement; various rumors, jokes, and comments that
allegedly persisted throughout the refinery following the incident;
and a report of their arrests that appeared in a local newspaper,
the St. Croix Avis.  Plaintiffs maintain that the statements in
question were false and that they were therefore defamatory.  They
also allege that the statements made by and/or attributable to
HOVENSA exposed them to ridicule and diminished their standing in
the community.  Plaintiffs assert that HOVENSA is vicariously liable
for the defamatory statements uttered.

Slander and libel are forms of defamation.  Slander is
defamation by spoken word while libel is defamation accomplished by
a writing or printed material.  E.g., 12th St. Gym, Inc. v. Gen.
Star Indem. Co., 93 F.3d 1158, 1163 (3d Cir. 1996).  Under Virgin
Islands law, a plaintiff establishes a cause of action for
defamation by demonstrating that the defendant's actions satisfied

-25-

the following four elements:  "(a) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of 'special harm' or the existence of 'special harm' caused by the publication."  Illaraza, 2010 WL 2342424 at *3; see also Restatement (Second) of Torts § 558 (1977).  Remarks that impute a criminal offense to a plaintiff are considered defamation *per se*, that is they are actionable regardless of whether the plaintiff can show special harm.  Restatement (Second) of Torts § 571 (1977); Charleswell v. Bank of Nova Scotia, 44 V.I. 36, 43 (Terr. Ct. 2001).

A true statement cannot serve as the basis for a defamation claim.  Restatement (Second) of Torts § 581A (1977); see also Flanders v. Shell Seekers, Inc., 39 V.I. 63, 68 (Terr. Ct. 1998).  In a defamation action, the defendant bears the burden of proving truth.  Wilson v. V.I. Water & Power Auth., No. 07-24, 2010 WL 5088138 at *7 (D.V.I. Dec. 7, 2010).  In support of their defamation claims, plaintiffs have pointed to a number of statements by HOVENSA employees about plaintiffs' alleged involvement in the theft and their subsequent arrests.  Some of the statements at issue involved various contentions that the plaintiffs had been arrested.  For example, HOVENSA security officials told Lazarus Joseph that the brothers had been arrested, while Mike Francis heard HOVENSA

-26-

employees making statements like "I hear your boys them got arrested" (referring to plaintiffs).  It is undisputed that the plaintiffs were arrested.  Any statement to the effect that Jose and Luis were arrested was therefore true, and cannot serve as the basis for a defamation claim.

A second category of allegedly defamatory statements involved claims that the brothers had committed or helped commit the theft.  For example, Lazarus Joseph testified that "security officers" told him that the brothers "probably were involved in the air conditioner" and HOVENSA maintenance coordinator Winston Sinanan told Gideon James that he had heard "that [the brothers] stole some stuff."  Reynaldo Illaraza ("Reynaldo"), who is the brother of Jose and Luis and is not a party in this action, overheard workers at the refinery discussing the fact that plaintiffs had been caught stealing an a/c unit.  The record contains genuine disputes of material fact as to whether these statements implicating the plaintiffs in a theft were true.  Accordingly, we will proceed by considering only those allegedly defamatory statements whose truth is in dispute.

In order to serve as the basis for a defamation claim, a statement must also constitute an unprivileged publication to a third party.  In other words, where the publisher is privileged to make the statement, no cause of action will lie.  The Virgin Islands recognizes an absolute privilege for statements made to law

-27-

enforcement personnel for the purpose of reporting a crime or initiating a criminal investigation.  Sprauve v. CBI Acquisitions, LLC, No. 09-165, 2010 WL 3463308, at *11 (D.V.I. Sep. 2, 2010) (citing Restatement (Second) of Torts § 587 (1977)).

In making statements to the VIPD and the prosecutor about the theft and the brothers' alleged involvement, HOVENSA and its representatives were therefore protected by the absolute privilege accorded to parties who make statements to law enforcement in order to report purported violations of criminal law.  See Sprauve, 2010 WL 3463308, at *11.  Plaintiffs allege that HOVENSA and its representatives, particularly Jay Galindo, defamed them by contacting the VIPD and falsely reporting their role in the theft of the a/c unit.  They also allege that HOVENSA representatives engaged in defamation by providing the (allegedly false) information which ultimately served as the basis for the VIPD's probable cause affidavit and for their prosecution.  Whatever HOVENSA reported to the police and prosecutor was protected by an absolute privilege.  A party cannot be subjected to defamation liability for reporting to the police his belief that a crime has been committed, even if this belief is unfounded or later turns out to be erroneous.  Virgin Islands law supports this conclusion, and plaintiffs' defamation claims for HOVENSA's statements to the police and prosecutor must fail.

The Virgin Islands also recognizes a conditional privilege for statements made under circumstances that "lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." Restatement (Second) of Torts § 596 (1977).  A party can avail himself of this privilege only if he or she does not abuse it.  <u>Id.</u> cmt. a.  The conditional privilege is considered to apply to "[p]ersons associated together in professional activities."  <u>Id.</u> cmt. d.

Plaintiffs claim that HOVENSA officials made defamatory statements about them by communicating to ACI representatives that they were involved in the alleged theft.  For instance, plaintiffs note Colabella's letter to ACI official James Workman, which stated that they had been denied access to the refinery "due to the admitted theft of HOVENSA property" and which ACI ultimately forwarded to the Steelworkers.  They also draw our attention to Galindo's statements to ACI officials immediately after the arrests. The record is undisputed that HOVENSA officials shared a common interest with the recipients of this information and reasonably believed that the recipients were entitled to receive it.  The record demonstrates without contradiction that HOVENSA officials were "associated together in [a] professional activit[y]" – that is, the ACI-HOVENSA contract – with ACI representatives, placing them

squarely within the protection of the conditional privilege.
Moreover, based on the evidence before us, it can only be concluded
that HOVENSA officials reasonably believed that ACI, as plaintiffs'
employer, was entitled to know that they were suspected of
involvement in the alleged theft, as well as the facts that served
as the basis for HOVENSA's suspicion.  Finally, there is no evidence
that HOVENSA abused this privilege.  Accordingly, we find that the
allegedly defamatory statements made by HOVENSA officials to ACI
officials fall within the scope of the conditional privilege, at
least insofar as they pertain to ACI and HOVENSA's shared
professional endeavor.

Having determined that plaintiffs cannot maintain a
defamation action based upon true statements about their arrests or
upon statements made by HOVENSA and its representatives to the
police, the prosecutor, and ACI, we need not determine whether these
statements satisfy the third and fourth prong of the defamation
analysis, that is, the "fault" prong and the "actionability" prong.

We are now left with the rumors that circulated at the
HOVENSA refinery about the theft, as well as the report in the St.
Croix Avis police blotter.  Plaintiffs urge that HOVENSA is
responsible for defaming them by failing to curb the rumors, jokes,
and negative comments that circulated at the refinery and throughout
the larger St. Croix community following their arrests.  Evidence in
the record supports plaintiffs' claim that these rumors were

pervasive.  For example, Gideon James stated in his deposition that he heard workers at the refinery "making little remarks and stuff like that about" the incident and that these rumors were "a refinery-wide thing."  ACI employee Leroy Peets recalled that "everybody was talking about" the arrests.  Reynaldo testified that he had heard workers discussing the fact that plaintiffs had been caught stealing the a/c unit.  The rumors about plaintiffs' arrests spread outside the refinery as well.  Mike Francis recalled hearing individuals in the street repeating the rumor that plaintiffs had been arrested and that they had been caught stealing the a/c unit.

        The record is less clear with respect to the details of the rumors at issue.  For the most part, James, Peets, and Reynaldo did not specify whether the alleged rumors were spread by ACI employees, HOVENSA employees, or both.[8]  Further, the record largely fails to make clear whether these rumors consisted of true statements that the brothers had been arrested, or allegedly false statements that the brothers had actually been involved in the theft.  Moreover, there is no evidence as to the source of these rumors.

---

8.  Plaintiffs do point to testimony given by James and Peets indicating that two individuals, Nicholas Lockhart and Cliff Augustine, actively participated in spreading the rumors at issue.  However, the record indicates that Lockhart and Augustine were employed by ACI and not HOVENSA.  For this reason, we are unable to attribute their conduct to HOVENSA.

Plaintiffs point concretely to only four statements which are not protected by the defenses of truth or privilege and whose substance is set forth in the record.  The first is the statement described in deposition testimony by Lazarus Joseph, who recalled a HOVENSA security guard telling him that the brothers "probably were involved in the air conditioner."  The second is described in deposition testimony by Mike Francis, who recalled hearing from HOVENSA security guards that "they had stuff on camera with them [plaintiffs] moving" the a/c unit.  We do not know how many security guards to whom Francis was referring.  The third is the recollection of Reynaldo Illaraza, the plaintiffs' brother, that he heard workers discussing the fact that plaintiffs had been caught stealing.  We do not know who they were, how many they were, whether they were HOVENSA employees, or what positions they held.  The fourth is a statement made by Francis in his deposition that HOVENSA employee Alexander John, whose title was "Supervisor Traffic/Offsites," said to him "[y]our boys them get catch t'iefing an A/C unit" (referring to plaintiffs).

In our view, these four instances are the only statements identified by plaintiffs that could conceivably constitute defamation.  All other statements identified by plaintiffs are either true, privileged, or described in too little detail to support a defamation claim.  Further, with the exception of their description of Alexander John's statement, plaintiffs fail to

-32-

identify critical details about these four allegedly defamatory statements, such as the identities of the speakers or the details of what was said.  Without admissible evidence about the source or substance of these rumors, we are unable to credit plaintiffs' allegations that these four statements serve as the basis for a defamation claim.

Furthermore, even if we could conclude based on the evidence available that the four statements described above were defamatory, plaintiffs have not sued the speakers but instead have sued HOVENSA, on the basis of vicarious liability.

The Virgin Islands recognizes the imposition of vicarious liability against employers for torts committed by their employees within the scope of their employment.  E.g., Warner v. Kmart Corp., No. 05-128, 2009 WL 1476476 at *5 (D.V.I. May 27, 2009); Tavarez v. Klingensmith, 267 F. Supp. 2d 448, 454 (D.V.I. 2003); see also Restatement (Second) of Agency § 219(1) (1958).[9]  An employee's conduct falls within the scope of his employment when

_____

9.  In their briefs, plaintiffs cite to the Restatement (Second) of Agency, and we rely on it here.  While we recognize that the American Law Institute has promulgated a Restatement (Third) of Agency, we note that Virgin Islands courts have continued to rely on the Second Restatement even after the promulgation of the Third Restatement.  See, e.g., Walker v. V.I. Waste Mgmt. Auth., No. 11-353, 2014 WL 3908570 at *4 (V.I. Super. Ct. Aug. 7, 2014); Warner, 2009 WL 1476476 at *5.  We also note that the Supreme Court of the Virgin Islands has held that Virgin Islands courts are not bound by changes to the Restatements, particularly where local law exists.  See Banks v. Int'l Rental & Leasing Corp., 55 V.I. 967 (V.I. 2011).  In any event, the conclusions we reach

> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized
> time and space limits;
> (c) it is actuated, at least in part, by a purpose
> to serve the master; and
> (d) if force is intentionally used by the servant
> against another, the use of force is not
> unexpectable by the master.

Restatement (Second) of Agency § 228(1) (1958).  Conversely, an

employee's conduct falls outside the scope of his employment

"if it is different in kind from that authorized, far beyond

the authorized time or space limits, or too little actuated by

a purpose to serve the master."  Id. § 228(2).

Virgin Islands law also makes clear that employers may not

be held liable for torts committed by their employees outside the

scope of their employment, except in limited circumstances.  These

limited circumstances include those in which

> (a) the master intended the conduct or the
> consequences, or
> (b) the master was negligent or reckless, or
> (c) the conduct violated a non-delegable duty of the
> master, or
> (d) the servant purported to act or to speak on
> behalf of the principal and there was reliance upon
> apparent authority, or he was aided in accomplishing
> the tort by the existence of the agency relation.

Warner, 2009 WL 1476476 at *5–*6 (citing Restatement (Second) of

Agency § 219(2) (1958)).

---

in reliance on the Restatement (Second) of Agency do not differ
from those we would reach were we to rely on the Restatement
(Third) of Agency.

Plaintiffs argue that HOVENSA is vicariously liable for defamation because the HOVENSA employees who made allegedly defamatory statements did so within the scope of their employment, or alternatively that liability can be imposed against HOVENSA for the statements even though they were made outside the scope of an employment relationship.  We are unpersuaded.  There is no evidence in the record that the statements we may properly consider here – that is, those statements that are not true, privileged, or insufficiently described by the record – were made by employees acting in the scope of their employment.  Plaintiffs have produced no evidence that the HOVENSA employees who made unprivileged and allegedly untrue statements about them were engaging in conduct "of the kind [they were] employed to perform" or that such conduct was "actuated, at least in part, by a purpose to serve [HOVENSA]."  As a result, any HOVENSA employees who made the allegedly defamatory statements before us did not do so within the scope of their employment.

Nor is there any evidence in the record that the allegedly defamatory statements fall within the exceptions to the general rule against vicarious liability for torts committed outside of the employment relationship.  Plaintiffs urge that HOVENSA is liable for the conduct of the employees who made the statements under part (2)(b) of § 219 of the Restatement (Second) of Agency, which establishes an employer's liability for acts committed outside of an

employment relationship but attributable to the employer's negligence or recklessness. However, there is nothing in the record to show that HOVENSA was negligent or reckless with respect to the allegedly defamatory statements. The record contains no indication that HOVENSA had actual or constructive knowledge of the statements of its employees or that HOVENSA's alleged negligence was in any way the cause of the rumors. HOVENSA cannot be held vicariously liable on this basis.

We also note that plaintiffs have failed to point to evidence that would reveal HOVENSA as the source of the rumors at issue. This court has previously held that an employee "cannot hold [her employer] liable for rumors generated by her co-workers." Smith v. V.I. Port Auth., No. 02-227, 2010 WL 1381222 (D.V.I. Mar. 31, 2010). Without evidence that HOVENSA or one of its higher level employees was the source of the allegedly defamatory rumors, we are unable to see a basis to hold the company liable for those statements.[10]

---

10. The only possible supervisory-level HOVENSA employee who is alleged to have participated in this alleged "rumor mill" is Winston Sinanan, who worked for HOVENSA as a maintenance coordinator. At some point in time not specified by the parties or the record, Sinanan attempted to "dig" for information from Gideon James, who worked for ACI, by asking "[w]hat happened to [the brothers], what did they steal, and stuff like that" and stating that he had heard "that they stole some stuff, and they got arrested." James, in his deposition, confirmed that it "seem[ed] like [Sinanan] was trying to dig . . . for information." Even if HOVENSA were responsible for Sinanan's role in the conversation, we would be unable to construe his inquiries as the type of "false and

Finally, we reject plaintiffs' claim that HOVENSA is liable for defamation because of statements it made to the St. Croix Avis, which published an account of plaintiffs' arrests in its police blotter.  The Avis published the same story with respect to both Jose and Luis.  It reported that each "was arrested for stealing an air conditioner from Hovensa [sic] valued at $500 after he was seen by multiple witnesses."  This report matches the information allegedly provided to the VIPD by Galindo, a communication which we have already determined was subject to an absolute privilege.  However, the record contains no indication that it was HOVENSA, as opposed to the VIPD or another party, that provided this report to the newspaper.[11]  Consequently, there is no basis to conclude that HOVENSA made defamatory statements to the St. Croix Avis, or that HOVENSA is responsible for the Avis's publication of the report in its police blotter.  Accordingly, plaintiffs' defamation claim, insofar as it concerns the report in the St. Croix Avis, cannot proceed.

In sum, no defamation liability can lie against HOVENSA for:  its statements to the police, prosecutor, and to ACI; the

---

defamatory statement[s]" that must necessarily serve as the basis for a defamation claim.

11.  In fact, Luis Illaraza conceded in his deposition that HOVENSA had provided information about the alleged theft "to the police, [and] from the police it went to the papers.  If HOVENSA didn't provide it to the police, it wouldn't had go to the papers."

factually accurate statements made by HOVENSA employees about plaintiffs' arrests; the alleged rumors that circulated about the theft; the few statements made by HOVENSA security guards and workers; or for the report in the St. Croix Avis.[12]  We will therefore grant summary judgment in favor of HOVENSA on plaintiffs' claims for defamation.

V.

The Illaraza brothers further claim that HOVENSA tortuously and wrongfully interfered with their contractual relationship with ACI and with their potential contractual relationships with other potential employers.  The brothers argue that HOVENSA effectively ended their employment contract with ACI by deactivating their badges and barring them from the refinery, where ACI did virtually all of its work on St. Croix.  They also claim that HOVENSA's actions interfered with their ability to work for any other employer who might contract with HOVENSA.[13]  Pointing to ACI's

---

12.  In their briefs, plaintiffs raise vague allegations that HOVENSA is somehow liable for allegedly defamatory statements made by ACI employees and for statements made by members of the St. Croix community who were not employed by either company. However, plaintiffs fail to provide any legal support for these allegations.  We can see no basis upon which to hold HOVENSA liable for the spreading of rumors by these individuals.

13.  In particular, Luis notes that he was denied a position with another company after his arrest.  This denial apparently occurred because the position would have required Luis to complete a safety course at the HOVENSA refinery which he was unable to attend because he had been banned from HOVENSA property.

inability to hire them for other work on the HOVENSA refinery following the events of August 2006, they urge us to conclude that a reasonable jury could find HOVENSA liable for intentionally interfering with their contractual relationship with ACI and their prospective contractual relationship with other employers.

The Restatement (Second) of Torts establishes that an actor engages in intentional interference with contractual relationship when he "intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract." Restatement (Second) of Torts § 766 (1979). In determining whether conduct is "improper," courts are directed to consider a number of factors.[14] However, the Restatement exempts from liability those actors who, "by asserting in good faith a legally protected interest of his own or threatening

---

14. Section 767 of the Restatement (Second) of Torts sets out the factors to be considered in determining whether interference is "improper." These factors include:

> (a)  the nature of the actor's conduct,
> (b)  the actor's motive,
> (c)  the interests of the other with which the actor's conduct interferes,
> (d)  the interests sought to be advanced by the actor,
> (e)  the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f)  the proximity or remoteness of the actor's conduct to the interference and
> (g)  the relations between the parties."

Restatement (Second) of Torts § 767 (1979).

in good faith to protect the interest by appropriate means, intentionally cause[] a third person not to perform an existing contract or enter into a prospective contractual relation with another" so long as the actor "believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." Id. § 773 (1979).

In support of their claim that HOVENSA's actions constituted intentional inference with contractual relationship, plaintiffs point us to Mendez v. HOVENSA, L.L.C., No. 02-169, 2008 WL 803115 (D.V.I. Mar. 24, 2008). In that case, a group of plaintiffs had been terminated from their employment with a contractor – allegedly at HOVENSA's behest – after becoming ill from drinking water provided by HOVENSA. Id. at *1-*2. The court found that there was a genuine issue of fact as to whether HOVENSA intentionally interfered with the plaintiffs' employment contracts, and denied summary judgment on that claim. Id. at *9. Plaintiffs cite to Mendez in support of their claim that a reasonable jury could find that HOVENSA's actions constituted intentional interference with a contractual relationship.

Mendez is inapposite. Here, unlike in Mendez, the record establishes without dispute that the allegedly tortious interference was motivated by HOVENSA's good-faith assertion of its own legally protected interest, that is, its interest in controlling who enters onto its land and in preventing and deterring theft of its property.

-40-

As HOVENSA points out, "each of [its] actions was reasonable and lawful under the circumstances known to it."  In light of these circumstances HOVENSA was privileged to deny the plaintiffs access to its land in order to protect its property.

The evidence is conclusive that HOVENSA had reason to deny plaintiffs access to its land.  For example, Colabella stated in his deposition that Cornelius Evans, the prosecutor assigned to the case, had given him "information that there is basically no opinion of guilt or innocence on [the] type of dismissal without prejudice" that was issued in plaintiffs' case.  Similarly, Galindo stated in his deposition that he continued to believe in Noelien's and plaintiffs' guilt, and that he believed the confession made by Noelien on the day of the alleged theft.  We acknowledge that HOVENSA continued to deny plaintiffs access to its property even after Noelien recanted his statement implicating them and even after the charges against them were dropped.  HOVENSA, however, was under no obligation to believe or accept a recantation of Noelien, who pleaded guilty to theft and was placed on one year's probation.  Plaintiffs can point to no evidence to show that HOVENSA's refusal to change its position on this point was not a "good faith" assertion of its own interests.  For this reason, HOVENSA's conduct in denying plaintiffs access to the refinery falls squarely within § 773 of the Restatement (Second) of Torts, which shields from liability those actors whose interference with a

-41-

contractual relationship constitutes a good-faith assertion of their legally-protected interests.

VI.

Plaintiffs have also alleged that HOVENSA engaged in abuse of process and malicious prosecution.

The Virgin Islands recognizes a cause of action for abuse of process against "[o]ne who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed." Illaraza, 2010 WL 2342424 at *5; Restatement (Second) of Torts § 682 (1977).  The gravamen of the underlying misconduct is "not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings" but the misuse of process.  Restatement (Second) of Torts § 682 cmt. a; cf. Deary v. Evans, 570 F. Supp. 189, 200 (D.V.I. 1983).  An arrest alone cannot give rise to an abuse of process claim since "arresting a criminal defendant is not using a legal process for a purpose for which it was not designed." Trunzo v. Mayer, No. 13-467, 2014 WL 2465269 (M.D. Pa. May 30, 2014).[15]

Plaintiffs argue that Galindo's animus against them prompted him to call the VIPD and provide "incomplete, false, and/or unsubstantiated information in order to encourage an arrest."  Even if plaintiffs are correct on this point, the actions of HOVENSA and

---

15.  As we do here, the Trunzo court relied on the definition of abuse of process set forth in the Restatement (Second) of Torts.

-42-

its representatives did not amount to the type of misuse of legal process necessary for a successful abuse of process claim.

Plaintiffs also urge that HOVENSA played a role in their prosecution as well as their arrests and that this serves as a basis for their abuse of process claims.  Plaintiffs contend that HOVENSA was eager to see them prosecuted.  They rely on a series of emails sent by Colabella to Galindo on August 11 stating that "Mike . . . wants to prosecute" and "wants a written report for Alex and Franklin to begin prosecution."[16]  The record provides no indication, however, that HOVENSA actually directed or assisted in plaintiffs' prosecution once they had been arrested.

In essence, then, plaintiffs' argument is not that HOVENSA misused legal proceedings but that HOVENSA wrongfully *procured* or *initiated* proceedings by seeking their arrests.  They urge that HOVENSA engaged in abuse of process by "calling the police to arrest" them and "g[iving] the police incomplete, false, and/or unsubstantiated information in order to encourage an arrest."[17]  This

---

16.  In their responses to HOVENSA's statements of undisputed facts in support of its motion for summary judgment, plaintiffs posit that "Mike" was HOVENSA CFO Mike Fennessey, "Alex" was HOVENSA Vice President Alex Moorehead, and "Franklin" was HOVENSA's in-house counsel Franklin Quow.

17.  Although the record does indicate that HOVENSA officials met with the prosecutor in plaintiffs' case on at least two separate occasions following their arrests, plaintiffs do not

cannot serve as the basis for an abuse of process claim under Virgin Islands law.  See Greene v. V.I. Water & Power Auth., No. 06-11, 2011 WL 3032466 at *12 (D.V.I. July 22, 2011); Restatement (Second) of Torts § 682 cmt. a.  Because an arrest such as the one at issue here cannot, standing alone, justify a finding of abuse of process liability, we must grant HOVENSA's motion for summary judgment with respect to plaintiffs' abuse of process claims.

Plaintiffs also allege that HOVENSA engaged in malicious prosecution by initiating their arrests.  Under Virgin Islands law, a plaintiff who raises a claim of malicious prosecution must show that the defendant "initiated the institution of criminal proceedings," that he did so "without probable cause" and "primarily for a purpose other than bringing an offender to justice," and that the proceedings terminated in the accused plaintiff's favor.  Greene v. V.I. Water & Power Auth., No, 06-11, 2012 WL 4755061 at *4 (D.V.I. Oct. 5, 2012); Restatement (Second) of Torts § 653 (1977).

The parties dispute whether or not HOVENSA initiated the criminal proceedings against plaintiffs.  According to the commentary that accompanies the relevant section of the Restatement (Second) of Torts, a defendant does not initiate the procurement of proceedings merely by providing information to a third-party public official, as long as "it is left to the uncontrolled choice of the

---

argue that HOVENSA's participation in these meetings constituted abuse of process.

third person to bring the proceedings or not as he may see fit."
Restatement (Second) of Torts § 653, cmt. d.  If the information in
question is known by the defendant to be false at the time he
provides it to the official, however, "an intelligent exercise of
the officer's discretion becomes impossible, and a prosecution based
upon it is procured by the person giving the false information."
Id. § 653, cmt. g.

   The record provides no support for a conclusion that
HOVENSA officials "initiated" or "procured" the proceedings against
plaintiffs.  While HOVENSA's Jay Galindo telephoned Officer Charles,
who in turn contacted his colleagues at the VIPD, there is nothing
before us that any HOVENSA official instructed VIPD officers to
arrest Jose or Luis.  Galindo's deposition, for example, merely
contains a statement that Galindo "asked [Officer Charles] if he
could come out to the scene and that [HOVENSA] had an investigation
. . . into a theft."  Nor does the record contain any support for
the notion that HOVENSA officials knowingly provided false
information to the VIPD in order to encourage the arrest and
prosecution of Jose and Luis.  While plaintiffs urge that Galindo
was remiss in failing thoroughly to investigate the alleged theft
before contacting the police, they provide no evidence in support of
the claim that Galindo, or any other HOVENSA official, provided any
information to the VIPD that they knew to be false.  We are

therefore unable to conclude that HOVENSA initiated or procured proceedings against plaintiffs.

Moreover, even if HOVENSA had initiated proceedings against plaintiffs, there is no evidence that HOVENSA did so without probable cause – "the sine qua non of malicious prosecution." See Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d 243, 249 (3d Cir. 2001). A plaintiff who raises a malicious prosecution claim has the burden of showing a lack of probable cause. The defendant need not prove that it had probable cause in order to prevail. Id.

Plaintiffs maintain that even if the VIPD had probable cause to arrest them, HOVENSA officials lacked probable cause to call the police. In support of this argument, they point us to Charleswell, in which the Territorial Court of the Virgin Islands denied a defendant's motion for summary judgment on a malicious prosecution claim on the basis of a possible lack of probable cause. 44 V.I. 36, 42. The defendant, a bank for which the plaintiff worked, had contacted the police about the plaintiff's alleged involvement in an unauthorized transaction but had withheld crucial information that could have exculpated her. Id. According to the Territorial Court, it was immaterial that the police department had probable cause to arrest the plaintiff. What mattered, for the purposes of her malicious prosecution claim, was whether the defendant had probable cause to call the police in the first place. Id. Relying on this precedent, plaintiffs urge that HOVENSA's

-46-

failure adequately to investigate their alleged involvement in the theft evinces a lack of probable cause and that this failure supports their malicious prosecution claim.

In Trabal, our Court of Appeals was presented with facts similar to those before us.  269 F.3d 243.  There, the plaintiffs brought a claim of malicious prosecution against their employer for investigating and then reporting to the police the plaintiffs' alleged involvement in the theft of a bag of money under defendant's custody.  Id. at 246–47.  In summoning the police, the defendant's Security Loss Prevention Manager had relied on the statements of a witness who was later shown to be unreliable.  The plaintiffs there argued that this factor, coupled with the defendant's failure to conduct a thorough investigation of the theft, showed a lack of probable cause.  Id. at 247, 250–51.  The district court granted summary judgment in the plaintiffs' favor on the issue of probable cause, and in a subsequent jury trial, instructed the jury that the probable cause element of the malicious prosecution claim had already been decided as a matter of law.  Following a verdict in the plaintiffs' favor, the defendant unsuccessfully moved for judgment as a matter of law, and then appealed.

The Court of Appeals disagreed with the district court's determination that the defendant had acted without probable cause. It explained that later revelations about the witness's lack of credibility were immaterial.  The crucial issue, for malicious

-47-

prosecution purposes, was whether the defendant had probable cause at the time it filed the criminal complaint against the plaintiffs. Id. at 250.  The Trabal court also rejected the plaintiffs' allegations that the defendant's security officer did not conduct a thorough investigation prior to initiating proceedings.  It concluded that he was under no obligation to "explore every potentially exculpatory lead before filing a criminal complaint or initiating a prosecution."  Id. at 250-51.

As far as the record discloses, when HOVENSA officials summoned the VIPD to the IQRA Academy, they knew that an informant had reported seeing individuals loading the a/c unit into a tractor-trailer, that that tractor-trailer had been driven off the refinery by Luis with Jose as a passenger, that Jose helped Noelien move the a/c unit into the pickup truck at the IQRA Academy, and that Luis rode in the pickup truck with Noelien away from the school.  At the time the VIPD arrived, Galindo had been told by Noelien that "Jose and Luis knew about it."  Plaintiffs urge that if Galindo had spoken with either of them, he would have learned that they were assisting Noelien based on their understanding that he planned to return the a/c unit to the waste site.  However, as was the case in Trabal, defendant here was not required to "explore every potentially exculpatory lead" before enlisting the help of the police.  See Trabal, 269 F.3d at 251.  To the extent that HOVENSA initiated proceedings against plaintiffs, it cannot be disputed that it had

-48-

probable cause to do so at the time the police were called, and HOVENSA's failure to pursue every possible lead does not change this fact.

Plaintiffs urge that Galindo had an "ulterior motive" in seeing them arrested and prosecuted and that HOVENSA's primary purpose in reporting the theft was not to bring the alleged offenders to justice.  Again no evidence in the record supports this contention.  HOVENSA is correct that any claims of an ulterior motive or improper purpose are, at best, "mere speculation" by plaintiffs.

There is no evidence that HOVENSA "procured" or "initiated" proceedings against plaintiffs.  Even if it had done so, there is no evidence that such a decision would not have been supported by probable cause.  For these reasons, plaintiffs malicious prosecution claims must fail, and we will grant summary judgment in favor of HOVENSA on those claims.

VII.

This brings us to the claims of the Illaraza brothers for intentional infliction of emotional distress or, in the alternative, negligent infliction of emotional distress.  Both plaintiffs contend that HOVENSA's actions rose to the level of intentional infliction of emotional distress or negligent infliction of emotional distress. Each has reported experiencing symptoms including sleeplessness,

stress, headaches, and indigestion as a result of the events of
August 2006.

In the Virgin Islands, a cause of action for intentional
infliction of emotional distress may lie against an actor "who by
extreme and outrageous conduct intentionally or recklessly causes
severe emotional distress to another." <u>Claytor v. Chenay Bay Beach
Resort</u>, 79 F. Supp. 2d 577, 583 (D.V.I. 2000); Restatement (Second)
of Torts § 46(1) (1965).[18]  "Extreme and outrageous conduct" is
defined as conduct "so outrageous in character, and so extreme in
degree, as to go beyond all possible bounds of decency, and to be
regarded as atrocious, and utterly intolerable in a civilized
society." <u>Thomas Hyll Funeral Home, Inc. v. Bradford</u>, 233 F. Supp.
2d 704, 714 (D.V.I. 2002) (quoting Restatement (Second) of Torts
§ 46 cmt. d); <u>see also, e.g.</u>, <u>McGreevy v. Stroup</u>, 413 F.3d 359, 371
(3d Cir. 2005).  The District of the Virgin Islands has established
that an independent intentional infliction of emotional distress
cause of action cannot lie where "the gravamen of the complaint
sounds in defamation." <u>Ali v. Intertek Testing Servs. Caleb Brett</u>,

---

18.  Both parties cite to the Restatement (Second) of Torts in
their briefs, and we rely on it here.  We note that the American
Law Institute has promulgated sections of the Restatement
(Third) of Torts that address infliction of emotional distress,
although it has not done so with respect to the other torts
identified by plaintiffs.  <u>See</u> Restatement (Third) of Torts
§§ 46, 47 (2012).  No Virgin Islands court has cited to the
relevant portions of the Restatement (Third) of Torts.  Even if
we were to do so, our conclusions would remain the same.

332 F. Supp. 2d 827, 831 (D.V.I. 2004) (quoting Barker v. Huang, 610 A.2d 1341, 1351 (Del. 1992)).

Plaintiffs identify eight bases for their intentional infliction of emotional distress claims.[19] The gravamen of at least three of these bases appears inextricably linked to their claims for defamation.[20] Insofar as plaintiffs rely on these defamation-related

_____

19. Specifically, each plaintiff bases his intentional infliction of emotional distress claim on the following actions allegedly taken by HOVENSA:

(1) a sham investigation into the alleged theft of an a/c from HOVENSA refinery; (2) falsely imprisoning him by blocking Noelien's vehicle with Plaintiff inside; (3) initiating criminal charges; (4) claiming to the police without justification that Plaintiff was involved with stealing an a/c; (5) deactivating Plaintiff's badge to work in the refinery, thereby constructively discharging him; (6) refusing to reactivate the badge when ACI and the Union requested it after criminal charges were dropped and ACI and the Union wanted Plaintiff back to work; (7) making the trumped up and unfair charges against Plaintiff and evidence by Galindo's false statements about the incident; and (8) defaming Plaintiff's reputation and character by making false statements calling Plaintiff a thief to its employees, ACI, the Union, and others.

These eight bases are articulated in each of the two briefs filed by the respective plaintiffs in opposition to HOVENSA's motion for summary judgment. We presume that the second factor is intended to apply only to the intentional infliction of emotional distress claim raised by Luis, given that Jose does not allege that he was falsely imprisoned in the pickup truck.

20. Specifically, plaintiffs base their intentional infliction of emotional distress and negligent infliction of emotional distress claims on, inter alia, HOVENSA's "claim[s] to the police without justification that Plaintiff was involved with stealing an a/c," its "making the trumped up and unfair charges against Plaintiff

bases, their intentional infliction of emotional distress claims cannot survive.  See Ali, 332 F. Supp. 2d at 831.

To make out a claim for intentional infliction of emotional distress, a plaintiff must show that a defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."  Thomas Hyll Funeral Home, 233 F. Supp. 2d at 714; Restatement (Second) of Torts § 46, cmt. d; McGreevy, 413 F.3d at 371.  Even if plaintiffs intentional infliction of emotional distress claims are distinct from their cause of action for defamation, there is an absence of any evidence that HOVENSA's conduct was so outrageous and extreme that it would justify a finding of intentional infliction of emotional distress liability.

In addition, plaintiffs have failed to make a showing that they suffered the requisite harms necessary to support an intentional infliction of emotional distress claim.  This court has previously made clear, in Pemberton Sales and Service, Inc. v. Banco Popular de Puerto Rico, that a plaintiff may only recover on an intentional infliction of emotional distress claim if "the distress inflicted is so severe that no reasonable man could be expected to endure it."  877 F. Supp. 961, 967 (D.V.I. 1994) (quoting

---

and evidenced by Galindo's false statements about the incident," and its "defaming Plaintiff's reputation and character by making false statements calling Plaintiff a thief to its employees, ACI, the [Steelworkers], and others."

Restatement (Second) of Torts § 46, cmt. j). The Pemberton Sales & Service court, granting summary judgment in favor of the defendant, found that this intentional infliction of emotional distress standard had not been satisfied by a plaintiff who had suffered hypertension, sleeplessness, and stress about his future, noting that such symptoms were "not of the type which are so severe that no reasonable person could be expected to endure them." Id.

Here, both plaintiffs have reported that they continue to experience regular headaches and sleeplessness following the events of August 2006. Jose has also stated that he experiences stress about how he will pay his bills and meet his obligations to his family. Luis noted that he experiences stress and anxiety as well as backaches and frequent stomachaches for which he has sought medical attention. As in Pemberton Sales & Service, these symptoms cannot properly be characterized as "so severe that no reasonable person could be expected to endure them." See id. Thus, plaintiffs have not shown the requisite harm for their intentional infliction of emotional distress claims.

Plaintiffs argue that, even if HOVENSA is not liable for intentional infliction of emotional distress, it is liable for negligent infliction of emotional distress. Under Virgin Islands law, a plaintiff who brings a negligent infliction of emotional distress claim must demonstrate both that the negligent conduct placed him in danger of his own safety and that he suffered some

-53-

physical harm as a result of the emotional distress.  E.g. Int'l
Islamic Cmty. Of Masjid Baytulkhaliq, Inc. v. United States, 981 F.
Supp. 352, 370 (D.V.I. 1997).  Plaintiffs have made no showing that
HOVENSA's conduct placed them in danger, nor have they provided any
basis for a conclusion that any physical harm they may have suffered
was the result of HOVENSA's actions or of any emotional distress
they experienced in connection with the events at issue.  We must
therefore grant summary judgment in favor of HOVENSA on plaintiffs'
negligent infliction of emotional distress claims.

VIII.

Finally, we turn to the claim brought by Luis Illaraza for
false imprisonment.[21]  Luis argues that HOVENSA officials falsely
imprisoned him during the period that preceded his arrest outside
the IQRA Academy by parking their vehicles in front of and alongside
the pickup truck in which he was riding as a passenger.  According
to Luis, this action prevented him from leaving the area.  He also
makes reference to his arrest by the VIPD as a basis for his false
imprisonment claim against HOVENSA.

To succeed on a false imprisonment claim in the Virgin
Islands, a plaintiff must prove that:  (1) the defendant acted with
the intent to confine him or a third party within boundaries fixed

---

21.  Jose Illaraza's complaint raises no false imprisonment
claim.  This appears to be so because Luis's claim for false
imprisonment centers on a series of occurrences for which his
brother Jose was not present.

by the defendant; (2) the defendant's act directly or indirectly
resulted in the confinement of the plaintiff or third party; and (3)
the plaintiff or third party is conscious of, or harmed by, the
confinement.  Illaraza, 2010 WL 2342424 at *6; Restatement (Second)
of Torts § 35 (1965).  To support a cause of action, a defendant's
confinement of the plaintiff or third party must be "complete."
Restatement (Second) of Torts § 36 (1965).  In other words, the
confined party must be unable to go in another direction in order to
escape the confinement.  E.g., id. cmt. a, illus. 1; Lloyd v.
Jefferson, 53 F. Supp. 2d 643, 673 (D. Del. 1999).  If "complete,"
however, even a brief restraint can give rise to a cause of action.
Byas v. Legislature of V.I., 2009 WL 485145, at *6 (D.V.I. Feb. 25,
2009); see also Blankenhorn v. City of Orange, 485 F.3d 463, 486
n.15 (9th Cir. 2007); Kerman v. City of N.Y., 374 F.3d 93, 125 (2d
Cir. 2004); Kelly v. Curtis, 21 F.3d 1544, 1556 (11th Cir. 1994).

        Luis Illaraza's First Amended Complaint does not make
clear whether his false imprisonment claim rests on HOVENSA's
alleged role in his arrest by the VIPD, on HOVENSA's act of
situating several HOVENSA vehicles in front of and alongside
Noelien's company-issued truck, or on both.  We first address the
possibility that the false imprisonment claim is based on HOVENSA's
alleged involvement in Luis Illaraza's arrest.  In his memorandum
opinion in support of an order granting ACI's motion to dismiss,
Judge Raymond L. Finch addressed a nearly identical claim against

ACI.  While Judge Finch dismissed the claim on the basis that Luis had failed to set forth sufficient allegations of ACI's involvement in his confinement, he also noted that "even if Plaintiff had asserted that ACI had instigated the arrest, no liability would lie with ACI because the Plaintiff has not shown that the arrest itself was illegal."  Illaraza, 2010 WL 2342424 at *6 n.12.  We reach the same conclusion here.  Without any evidence before us that Luis Illaraza's arrest was illegal, we are unable to conclude that any role HOVENSA may have played in that arrest constituted false imprisonment.

To the extent that Luis's false imprisonment claim is based on his purported confinement in the pickup truck while HOVENSA officials interviewed Noelien and summoned the police, we are similarly unpersuaded by his arguments.  To succeed on this claim, Luis must demonstrate that HOVENSA's actions directly or indirectly resulted in his confinement, and this confinement must have been "complete."  Restatement (Second) of Torts §§ 35-36 (1965).  Nothing in the record indicates that Luis lacked a reasonable means of escape during the time that he remained in the truck.  To the contrary, it appears that HOVENSA officials pulled their vehicles in front of, and to only one side of, the truck in which Luis was a passenger.  Nowhere does Luis allege that he could not have left the area by exiting through the side of the truck that was not blocked by a HOVENSA vehicle.  In short, Luis's

-56-

confinement was not "complete," and HOVENSA is entitled to summary judgment on his false imprisonment claim.